[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The accident:
This action arises out of a motor vehicle accident which occurred at about 8:45 AM on February 1, 1996 in the Town of Windham, Connecticut. The Plaintiff, Jennifer Ottiano, was operating a 1988 Isuzu pickup truck northbound on Ash Street, taking her fifteen year old brother, the Plaintiff James Ottiano, who was a passenger in the right front seat of that truck, to Windham High School. They had stopped earlier at a convenience store and were now at the intersection of Ash Street and Chapman Street, about five minutes away from the school. Although they were a little later than usual, it was of no consequence and they were not in a hurry. The weather was clear and bright. The road was wet. This was the route they usually traveled as Jennifer regularly transported James to school. They were both familiar with the road.
The Defendant, Robert Erfe, age 19, graduated from high school in 1995. In July of that year, some six months before the accident, he received his drivers license. On February 1, 1996, he was operating a large 1994 Chevrolet "cab-over" chassis with a steel rack body and rear hydraulic lift called a "Tiltmaster". The gross vehicle weight was 14,250 lbs. No evidence was introduced that Mr. Erfe had any special training to operate this truck which was owned by the Defendant, Shetucket Plumbing Supply Co. Mr. Erfe had worked for this company for a little over a month as a driver. He had driven the truck in question before. On the day of the accident, he had made a delivery and was returning to his employer's shop to pick up materials for another delivery. He was operating in an easterly direction on Chapman Street and had reached its intersection with Ash Street. Chapman Street at this point had a flashing red traffic control signal and stop sign. Ash Street had no traffic control sign but did have a flashing yellow traffic control signal for north and southbound traffic.
The Defendent, Mr. Erfe, was not familiar with this CT Page 12046 intersection nor with Willimantic in general. He was intending to proceed through the intersection onto Adelbert Street, the name of the street which is in fact a continuation of Chapman Street after the intersection. Approaching the same intersection from the east on Adelbert Street was a vehicle operated by Pedro Rivera with Charles Stewart as a passenger. Mr. Rivera observed Mr. Erfe slow down at the stop sign and then speed up as he entered the intersection. He did not bring the truck to a complete stop. As Mr. Rivera observed Mr. Erfe in the intersection, he saw the Plaintiff enter the intersection and strike the right front side of the Defendant's truck. Mr. Stewart noted that the Plaintiff tried to turn to the right to avoid the Defendant but was unable to accomplish this successfully. James noted that Jennifer swerved to the right and applied the brakes. There was no credible evidence that speed was a factor in this accident. Although there was sand on the sides of Ash Street, it was not a factor in the accident.
The investigating police officer did not interview either occupant in the Plaintiff's vehicle, not the Defendant, Mr. Erfe, although she gave him a ride to the police station where his employer could pick him up. She did ask Mr. Rivera what direction each was coming from, but nothing further. At the police station she spoke with Mr. Erfe's boss, a representative of the company which owned the truck but who was not at the scene of the accident. The police report is inaccurate as to several critical facts: the road conditions, the intended direction of the Defendant's truck, and whether the Defendant, Mr. Erfe, stopped at the stop sign before entering the intersection.
The collision of the front Plaintiff's truck with the side of the Defendant's truck was violent. The front of Plaintiff's truck was destroyed and the windshield was smashed where Jennifer's and James' head struck it with considerable force. The Defendant's truck sustained damage in excess of Eight Thousand ($8,000) Dollars. Upon exiting his truck after the impact, Mr. Erfe left the scene without making inquiry as to the well being of the occupants of the other vehicle, one of whom was unconscious. He stated that he went to a nearby building to telephone his boss. He did not return to the scene until after the police had arrived. Mr. Rivera, who had witnessed the entire accident, stopped and ran to the Plaintiff's vehicle, where he discovered Jennifer unconscious. He checked for vital signs and ran to a nearby phone to call 911. CT Page 12047
The proximate cause of this accident was the failure of the Defendant, Robert Erfe, to stop at the intersection of Chapman Street with Ash Street as required by the traffic control signal and sign, his failure to observe the presence of the Plaintiffs approaching the intersection and his failure to grant them the right of way. Although the Defendants have alleged contributory negligence on the part of the Plaintiff, Jennifer Ottiano, they have not sustained their burden of proof that such was the case. No accident reconstruction expert testimony was offered in an attempt to establish an unreasonable speed, and the only witness to testify as to speed, James Ottiano, indicated that her speed was "not fast at all" and at another point he indicated that her speed was no more that 25 miles per hour. As stated above, he testified that Jennifer attempted to swerve to the right and she applied her brakes. AIthough James may have noticed the truck entering the intersection without stopping for the stop sign a split second before Jennifer did, because of the shortness of time available to her, there is no finding that she failed to keep a reasonable and proper lookout for the Defendant.
Plaintiff, James Ottiano, age 16 at the time of the bringing of this action, ppa. his father, Robert Ottiano:
Upon impact, James Ottiano was thrown forward violently, his head striking and shattering the windshield. He did not lose consciousness and was transported to Windham Hospital emergency room by ambulance. He had sustained numerous glass shard lacerations of the forehead, a 4 cm laceration of the left eyelid, and two other lacerations of the forehead requiring repair. Eight months later he underwent laser surgery for the removal of remaining glass shards and resurfacing was done. Fourteen months after the accident he continued to have significant redness in the area of the laser resurfacing. As he appeared at trial he still had significant scarring of the forehead. He has no feeling in the area of the left forehead. Additionally, he suffered a concussion, nerve damage to the left super orbital nerve, bilateral ankle sprains, spinal strains and sprains, and post traumatic stress disorder, including teeth grinding in his sleep. He incurred medical expenses of $4,047.62.
Plaintiff, Jennifer Ottiano:
Jennifer Ottiano has no memory of the events leading up to the accident, the impact, her transport to the hospital, nor her initial treatment in the hospital. She lost consciousness. Her CT Page 12048 first memory after the accident was in the hospital although she did not know how long she had been there. Physical evidence of the vehicle she was driving reveals she struck the windshield at the top left corner, shattering it. She sustained a concussion, multiple abrasions on her forehead, a small laceration on the lateral aspect of her right knee, bilateral forearm strains, cervical and lumbar spinal strains, a right ankle sprain, and a strain and bone contusion of the right knee.
As a result of the facial injuries, cosmetic laser surgery was required. The various strains and sprains eventually resolved over time and with considerable therapy. The injury to the knee presented much more difficulty and was not fully rectified at the time of trial (August, 1998). Her treating physician and surgeon for her knee, Dr. Fadale, feels that she suffered a 7% permanent partial impairment of the right extremity and a 3% permanent partial impairment of the whole person as a result of this injury. She incurred medical expenses of $10,190.96 and lost wages of $4,326.70.
The effect of this accident on Jennifer's life is unique. Prior to the accident, from age 10, she was an active athlete in the sports of wrestling and judo. She exhibited great talent at that age and began a regimen that would include practice, training, running, weight lifting, and video study which intensified as she advanced in age and stature in her chosen sports. By 1988 and each year thereafter up until the time of the accident she was competing successfully in foreign countries and in the United States. She competed in England twice, in Canada, in Hawaii, in California and Florida, and throughout New England. She won championships in New England and regional championships. By 1992, she was ranked number one in her weight class in the United States. In 1993 she celebrated her birthday in Kiev, Russia while competing there and placing fifth in the World Championships. In that same year she competed twice in Japan. In 1994, she competed again in Japan as well a in Germany, Austria and Poland. In 1995 she again placed fifth in the world in the competition in Russia. Throughout all of this she maintained high academic grades. In 1996 she was to compete in Sweden, but the accident which is the subject of this case cut that short. Her aspiration to compete in the Olympics was practically assured as a result of her past accomplishments. But judo and wrestling require speed, agility and strength.
Jennifer's trainer testified that training is "everything" in CT Page 12049 these sports. Superior training, coupled with the mental acumen and "guts, determination, discipline" makes a champion. Jennifer possessed all of these attributes. However, the legs are of major importance both in training and in competition. Legs are important in the physics of a throw of the body. They give speed and drive. They are paramount to success. As a result of the injury to her knee, she is unable to rotate the knee with any degree of strength or speed. Although she can run in a straight direction, she cannot spin or rotate the right knee. Because of the permanent injury to her knee, Jennifer will never be able to compete again in her chosen sports.
Once she reached a certain level in the national competitions, all of her expenses were paid for by the national organization. This included all of her multiple travels around the world. This arrangement would have persisted until she either withdrew or lost certification points which would render her no longer eligible to receive those financial benefits. She testified that she had no intention of withdrawing, and her international ranking meant she was in no danger of losing her certification points for many years to come. Only physical injury could knock her out of the competition, and that is what happened to her as a result of this accident.
The quality of her life until the accident was extraordinary for such a young student. She traveled the world extensively gaining the benefits and experiences of travel while also competing in her chosen sports. She took full advantage of the opportunities to expand her horizons, insuring that she had enough extra time in a foreign country to tour and absorb the culture. There was testimony of the emergence of these sports into the national view, with such media channels as ESPN starting to broadcast some of the competitions. The value of this from endorsements, while real, is speculative. There is little doubt but that she would have been an Olympic contender in her chosen fields.
Judgement
The Plaintiff, Jennifer Ottiano is awarded $140,000.00 damages.
The Plaintiff, James Ottiano p/p/a Robert Ottiano is awarded $44,000.00 damages.
Mack, J. CT Page 12050